'IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VERONICA W. OGUNSULA,
*Plaintiff*,

  v.                                                    Civil Action No. ELH-20-2568

MARYLAND STATE POLICE, et al.,
*Defendants*.

## MEMORANDUM OPINION

The self-represented plaintiff, Veronica Ogunsula, an African American woman, had an unfortunate experience that began on August 30, 2017, while she was driving from her home in Maryland to New Jersey.  During a traffic stop of plaintiff for alleged unlawful use of her cell phone while driving, the Maryland State trooper who conducted the stop discovered an arrest warrant for plaintiff, issued in Virginia in March 2017, charging her with failure to return a rental vehicle.  As a result, plaintiff was arrested and then taken to the Harford County Detention Center ("HCDC" or "Detention Center"), where she remained until the night of September 2, 2017.  The Virginia warrant was subsequently withdrawn.

This civil rights suit followed on August 31, 2020, under 42 U.S.C. § 1983.  Plaintiff has sued the Maryland State Police (the "MSP"); Maryland Trooper First Class Michael Warrenfeltz, in his individual and official capacity; Colonel Woodrow W. Jones III, superintendent of the MSP, in his official capacity; and Michael Capasso, Warden of the Detention Center, in his official

capacity.  ECF 1 (the "Complaint").[1]  I shall refer to all defendants, other than Capasso, as the "MSP Defendants."

Plaintiff alleges, *inter alia*, that TFC Warrenfeltz violated her rights under the Fourth and Fourteenth Amendments to the United States Constitution in connection with the traffic stop on August 30, 2017.  *Id.* at 2.  Moreover, she claims that correctional officers working at the Detention Center violated her due process rights by detaining her without making known the charges against her; holding her after she obtained bail; and confining her for an excessive amount of time.  *Id.* She seeks compensatory and punitive damages, as well as costs and legal fees.  *Id.* at 7.[2]  And, Ogunsula seeks injunctive relief.  *Id.*

The MSP Defendants moved to dismiss the Complaint for failure to state a claim or, in the alternative, for summary judgment.  ECF 23.  It is supported by a memorandum of law (ECF 23-1) (collectively, the "MSP Motion") and two exhibits.  ECF 23-2; ECF 23-3.  Ogunsula opposes the MSP Motion (ECF 28, the "MSP Opposition") and has submitted four exhibits (ECF 28-1 to ECF 28-4). The MSP defendants have replied.  ECF 33 (the "MSP Reply").

Capasso has also moved to dismiss or, in the alternative, for summary judgment.  ECF 31. His motion is supported by a memorandum of law (ECF 31-1) (collectively, the "Capasso Motion"), as well as several exhibits.  *See* ECF 31-2; ECF 31-3; ECF 31-4.  Plaintiff opposes the Capasso Motion (ECF 34, "Capasso Opposition") and has submitted three exhibits.  *See* ECF 34-1; ECF 34-2; ECF 34-3.  Capasso replied.  ECF 39 (the "Capasso Reply").

---

[1] The Docket initially did not reflect that Warrenfeltz was a named defendant.  But, it is evident from the face of the Complaint that plaintiff intended to name Warrenfeltz as a defendant. Therefore, by Memorandum (ECF 15) and Order (ECF 16) of February 8, 2021, I directed the Clerk to add Warrenfeltz as a defendant.

[2] The basis for the request for legal fees is not apparent, given that plaintiff is self-represented.

Plaintiff has filed a "Motion to Strike Warden Michael Capasso's Motion to Dismiss or in the Alternative, Motion for Summary Judgment." ECF 35 ("Motion to Strike"). In essence, she objects to the Court's Memorandum (ECF 25) and Order (ECF 26) of April 6, 2021, which provided Capasso an extension of time in which to respond to the Complaint. *See* ECF 35 at 1. Ms. Ogunsula has also moved to amend the Capasso Opposition (ECF 34) and the Motion to Strike (ECF 35). *See* ECF 36 ("Motion to Amend Briefing"). Along with the Motion to Amend Briefing, plaintiff filed a revised version of the Motion to Strike (ECF 36-1 at 1-4); a revised version of the Capasso Opposition (ECF 36 at 4-10); and a redlined version of the Capasso Opposition (ECF 36-1 at 5-11).

Then, on May 27, 2021, plaintiff filed a motion to amend her Complaint. ECF 37 ("Motion to Amend Complaint"). She provides no reasons for the amendment, nor does she specify the proposed amendments. And, she did not include a redlined version of the proposed Amended Complaint, as required by Local Rule 103.6(c). The proposed amended complaint is docketed at ECF 37-1. According to the caption, plaintiff seeks to add as defendants certain "Unnamed Correctional Defendants," and she seeks to sue Capasso in his official and individual capacities.

Capasso opposes the Motion to Amend Complaint, on the ground that it is futile. *See* ECF 38. The MSP Defendants have also responded (ECF 40), but they "defer to the Court's judgment whether to grant leave to amend the complaint." *Id.* at 3. Plaintiff has not replied, and the time to do so has expired. *See* Local Rule 105.2(a).

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant plaintiff's Motion to Amend Briefing (ECF 36) and deny the Motion to Strike (ECF 35; ECF 36-1 at 1-4). In addition, I shall grant the MSP Motion and the Capasso Motion, with leave to amend as to plaintiff's Equal Protection claim against Warrenfeltz, as well as her

claim against defendant Capasso.  I shall grant the Motion to Amend Complaint (ECF 37) in part and deny it in part, without prejudice to plaintiff's right to file another proposed amended complaint, consistent with the analysis herein.

## I.      Factual and Procedural Background[3]

Ms. Ogunsula's ordeal began on  August 30, 2017, after she "left her residence in College Park, Maryland to travel to Highstown, New Jersey" by way of the interstate highway.  ECF 1 at 3.  Plaintiff was driving a rental car that she had obtained from the "Budget Rental Car at Baltimore Washington Airport" for a one-week period, from August 24, 2017 to August 31, 2017.  *Id.* at 4.  According to plaintiff, she had placed her cell phone on the passenger seat of the vehicle because she was using its Global Positioning System ("GPS") for directions to Highstown.  *Id.* at 3.

Plaintiff was traveling north on I-95 and proceeded through the Fort McHenry toll booth.  Soon after, she noticed a four-door vehicle "pull up beside her and drive parallel with her vehicle."  *Id.*  According to Ogunsula, the car appeared to be "'tracking' her," which plaintiff found to be "unsettling" because "the car had dark tinted windows" and she "could not determine who was driving the car . . . ."  *Id.* (internal quotation marks omitted).  As the vehicle passed, plaintiff observed an antenna on the rear of the car, which led her to believe that the driver was a police officer.  *Id.*  At this point, Ogunsula "glanced at her speed . . . to make sure she was not speeding," and then "kept driving toward her destination."  *Id.*

Plaintiff then "picked up an (one) Sony earbud . . . from her lap" and placed it in her ear.  *Id.*  However, "[s]he was not on a call on her cell."  *Id.*  By this point, "the car had moved behind her."  *Id.*  She then "quickly moved her cell phone to her lap to attach her earbud."  *Id.*  And,

---

[3] Given the posture of the case, the Court assumes the truth of the allegations in the Complaint.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

plaintiff "changed lanes to let the car behind her pass by." .  However, the car followed Ogunsula and then "turned on its police lights to pull her over."  ECF 1 at 3.  Plaintiff "pulled over and stopped the car."  *Id.*

A white police officer, in uniform, exited his vehicle and approached the passenger side of plaintiff's car.  *Id.*  Ogunsula rolled down the window of her vehicle.  *Id.*  According to the Complaint, Warrenfeltz asked plaintiff if she had been "on her cell phone."  *Id.*  Plaintiff told the officer that "she had moved her cell phone from the passenger seat to her lap" because she was "using the phone for GPS."  *Id.*  But, she also said she "was not talking on the cell phone.  She was using the phone for GPS."  *Id.*  Notably, plaintiff asserts:  "The officer did not observe her with her cellphone in her hand or her breaking any Maryland traffic laws . . . ."  *Id.* at 4.  Accordingly, she contends that the police officer "had no reasonable basis to believe that she had broken any traffic laws within the State of Maryland," and the traffic stop was "baseless."  *Id.*

The officer, who has been identified as Warrenfeltz, asked plaintiff for her driver's license and registration, which plaintiff produced.  *Id.*  Thereafter, the officer returned to his car, where he remained, according to Ogunsula, for more than twenty minutes.  *Id.*  This delay made plaintiff "anxious because she had an appointment in New Jersey."  *Id.*  And, she asserts that she wanted to "get out of [her] car and walk to the officer's car, but she was nervous about doing that because of the numerous incidents where unarmed people were shot by the police."  *Id.*

Upon Warrenfeltz's eventual return to plaintiff's vehicle, he directed plaintiff "to get out of the car."  *Id.*  She was "astonished," and "asked what the issue was."  *Id.*  The officer asked Ogunsula "about the contents of her pockets or if she had any weapons or drugs on her, or anything that could cut him."  *Id.*  "She replied no," and again asked the officer "what this was about."  *Id.* The officer informed plaintiff that "there was an active warrant out for her arrest."  *Id.*  Plaintiff

then asked the officer for information regarding the underlying charges. ECF 1 at 4. At first, he said only that "you know what the warrant is for." *Id.* However, plaintiff "was totally flabbergasted." *Id.* The officer searched plaintiff and then handcuffed her, claiming "she had stolen the car." *Id.* And, after Ogunsula inquired further, the officer indicated that the warrant for her arrest was issued in June 2017. *Id.*[4] Plaintiff asserts that she knew then that "the charges were false." *Id.*

By this time, two other white officers arrived on the scene. *Id.* Warrenfeltz then "preceded [sic] to begin putting her in [his] car." *Id.* At this time, Ogunsula "complained that the handcuffs were too tight" and were "cutting the skin on her hands," and she asked Warrenfeltz to loosen the handcuffs. *Id.* He complied, but only after one of the other officers suggested he should do so. *Id.* But, he "never read her rights." *Id.*; *see also id.* at 5.

After Ogunsula was secured in Warrenfeltz's vehicle, the three officers searched plaintiff's vehicle. *Id.* at 4. Plaintiff asked the officers to grab her "small satchel that she was carrying in lieu of a purse." *Id.* Warrenfeltz refused, obtaining only plaintiff's "cell phone and its case with her license and bank cards." *Id.* Ogunsula was then told that her rental car would be towed. *Id.* at 5.

Plaintiff avers that Warrenfeltz never stated that she was under arrest, nor did he advise her of her rights. *Id.* at 4; *see Miranda v. Arizona*, 384 U.S. 43 (1966). And, the trooper "never issued a traffic citation for the traffic stop." ECF 1 at 5.

Warrenfeltz drove plaintiff to the Detention Center and walked her inside. *Id.* Ogunsula alleges that her cell phone, which Warrenfeltz had carried into the HCDC, was still "audibly giving

---

[4] As discussed, *infra*, a copy of the arrest warrant is included as an exhibit to the MSP Motion. *See* ECF 23-3 at 12-15. It indicates that the warrant was issued on March 30, 2017. *Id.* at 12.

directions." ECF 1 at 5. Warrenfeltz then asked for the password to plaintiff's cell phone, which plaintiff refused to provide. *Id.* Thereafter, "the officers at the detention center took possession of [plaintiff's] cell phone." *Id.*

At HCDC, Ogunsula "asked if she could make a call to New Jersey to tell them that she would not make the appointment," but she was told that "she was not allowed to make any phone calls at that time." *Id.* Plaintiff was then placed in a "cell with a cement bench and a toilet with several other people for several hours." *Id.* After plaintiff was detained for "at least 8 or 9 hours," she was given permission to use a bathroom in the Detention Center's lobby and provided with a cell phone to make a phone call. *Id.*

Around this time, plaintiff was "taken to see the commissioner." *Id.* Ogunsula avers that she remained unaware of "the charges against her" and had no knowledge of the "details regarding the warrant." *Id.* And, the commissioner was not able to provide plaintiff with much clarity. Instead, he indicated only that "he would find out the details regarding the charges." *Id.* The commissioner also asked plaintiff if "she wanted a public defender." *Id.* Ogunsula declined, and asked "to contact a private attorney." *Id.* Plaintiff also asked the commissioner to release her, but was told that "that she would have to go before a judge the next day." *Id.* Plaintiff was then "taken back to a holding cell." *Id.*

Between two and three hours later, plaintiff was "taken back to the commissioner," who provided her with "a copy of a warrant stating that she had rented a car at National Airport in Arlington, VA." *Id.* A copy of the arrest warrant is included as an exhibit to the MSP Motion. *See* ECF 23-3 at 12-15. It was issued on March 30, 2017, in the General District Court of Arlington County, Virginia. *Id.* at 12. And, it indicates that Ogunsula had been accused of "Fail To Return Bailment Property Valued >= $200", in violation of Virginia law. *Id.* at 14.

Moreover, the warrant included a summary of a criminal complaint against Ogunsula.  It said, in relevant part, ECF 23-3 at 15:

> On January 19, 2017 the accused rented a 2017 Silver KIA Sportage . . ., valued at $15,437.39.  The accused entered into rental agreement . . . on that date and was scheduled to return the vehicle February 10, 2017.  When the vehicle was not returned as required by the contract, Hertz contacted the renter to re-acquire the vehicle, but without success.  Hertz then proceeded through all required steps, including a Demand Letter, to regain the vehicle, again, to no avail.

> On March 29, 2017 Hertz contacted the Metro. Washington Airports Authority . . . Police and reported the car stolen.

> Contact was made with Ogunsula on March 29, 2017 and she was notified that she was in possession of a stolen vehicle.  Ogunsula was instructed to contact Hertz immediately to facilitate the vehicle's return.  Ogunsula was also notified that Detective Dower would follow up with Hertz and Ogunsula on March 30, 2017 to check the status of the vehicle turn in, and that Dower would obtain a warrant for her arrest if no attempt had been made by Ogunsula to contact or return the vehicle to Hertz.

> On follow up March 30, 2017 Hertz showed no record of contact or return, and attempts to contact Ogunsula . . . showed no attempt had been made to return the vehicle.

Ogunsula told the commissioner that "the charges were false and that she had never rented a car at National Airport or in Virginia."  ECF 1 at 5-6.  Thereafter, plaintiff "called an attorney, but it was after midnight."  *Id.* at 6.  And, when Ogunsula "called the number, she seemed to be disconnected by the phone system."  *Id.*

The following morning, Ogunsula "was transported in a van with other men and women to the Courthouse."  *Id.*  She indicates that "[t]hey all were handcuffed and shackled with a fencelike barrier separating the men from the women."  *Id.*  And, they "were not in seat belts."  *Id.*

Plaintiff represented herself at her hearing and "told the Judge that she was not guilty."  *Id.* The judge advised Ogunsula that "the charges against her were serious," and set her bond at

$5,000.  ECF 1 at 6.  According to records submitted with the MSP Opposition, plaintiff was held on charges of "Fugitive from Justice—VA."  ECF 28-3 at 3.

Plaintiff indicates that "[w]hen she was brought back from the hearing, she was not explained how the Bail would work."  ECF 1 at 6.  However, "the correctional officers told her that in order to be released she had to contact a Bail Bondsmen" and plaintiff was "shown a list on the wall" of possible providers.  *Id.*  Ogunsula avers that she "asked several times to make calls to someone who could pay the bail," but was "told not now or that she would have to wait until she got out for her one hour break once a day."  *Id.*

Further, Ogunsula indicates that correctional officers told her that "she was to be extradited to Virginia," which, according to plaintiff, "conflicted with what the Judge had said at the Hearing . . . ."  *Id.*  Thereafter, plaintiff requested the documents from her hearing.  *Id.*  But, she did not receive them until Friday, September 1, 2017, and only after she had "requested to be taken back to Court to file a Motion regarding the Judge's Order."  *Id.*[5]  However, she notes that she "was not taken to Court as requested."  *Id.*

The Complaint states that "according to Harford Jail docs, [plaintiff] was to be detained and extradited to Virginia and that could take up to 90 days."  *Id.*  And, Ogunsula notes that a "Sheriff came to speak with her and stated that she needed  a lawyer."  *Id.*  But, plaintiff told the sheriff that "she was representing herself at the moment."  *Id.*  Plaintiff's bail was ultimately paid on September 1, 2017.  *Id.*  However, Ogunsula indicates that she was not released from the

---

[5] The Complaint indicates that plaintiff received these documents on September 2, 2017. ECF 1 at 6.  However, in subsequent filings, plaintiff represents that this was a typo and that she received the requested information on September 1, 2017.  *See* ECF 36 at 5.

Detention Center until after 11:00 p.m. on the night of September 2, 2017, eighteen hours after her bail was paid.  ECF 1 at 6.[6]

Records submitted with the MSP Opposition reflect that on or about September 18, 2017, the officer who initially applied for the Virginia warrant for plaintiff's arrest "returned all copies of the unserved warrant to the Arlington [Commonwealth Attorney's] Office."  ECF 28-3 at 5. Moreover, the officer "provided [these copies] with a request to have the warrant withdrawn and destroyed to the Duty [Commonwealth Attorney] . . . ."  *Id.*  And, on October 5, 2017, the State of Maryland entered a Nolle Prosequi as to plaintiff's fugitive charge.  *See id.* at 1, 3.

Three years later,  on August 31, 2020, plaintiff filed the instant action.  *See* ECF 1.  As mentioned, she seeks compensatory and punitive damages as to the MSP, Warrenfeltz, and the Detention Center, as well as an award of costs and attorneys' fees.  *Id.* at 7.[7]  And, Ogunsula seeks injunctive relief.  *Id.*  In particular, she asks the Court to issue an order requiring that all MSP officers "adhere to annual diversity and anti-racial profiling training," and mandating that all "correctional officers provide to detainees and inmates information regarding their rights, access to phone calls, access to information regarding Bail bonds, and policies of Detention facility regarding confinement to a cell and time allowed outside of the cell."  *Id.*

On February 3, 2021, plaintiff filed a motion for Clerk's entry of default as to all defendants.  ECF 7.  In an accompanying affidavit, Ogunsula claimed that she served defendants in late December 2020 and early January 2021, and that no defendant had filed a timely response. *See* ECF 7-1.  However, plaintiff did not provide the Court with certified return receipts.  Rather,

---

[6] The Complaint states that plaintiff was not released until the night of September 3, 2017. ECF 1 at 6.  But, plaintiff's later filings reflect that Ogunsula was released on September 2, 2017. *See* ECF 28-3 at 4; ECF 37-1 at 7.

[7] As referenced above, plaintiff is proceeding pro se.  Therefore, the basis for the request for legal fees is not clear.

she attached the electronic tracking information from the United States Postal Service's website. ECF 7-2; ECF 7-3.

The following day, the Clerk entered defaults as to MSP (ECF 8); Jones (ECF 9); and Capasso (ECF 10). On February 5, 2021, the MSP Defendants filed an opposition to the entry of default. *See* ECF 14. They conceded that service had been accepted as to the MSP and Jones. *Id.* at 1. But, they requested an extension until March 5, 2021, to respond to plaintiff's suit. *Id.*

By Memorandum (ECF 15) and Order (ECF 16) of February 8, 2021, I directed the Clerk to strike the entries of default as to the MSP and Jones, in light of the Fourth Circuit's strong preference that "'cases be decided on the merits.'" ECF 15 at 2 (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993)). In addition, I explained that plaintiff had not properly effected service on defendants Capasso or Warrenfeltz. ECF 15 at 3. Therefore, I directed the Clerk to reissue summons as to Capasso and I granted plaintiff twenty-eight days from the date of that issuance to effect proper service. *See* ECF 16. However, I did not require plaintiff to effect proper serve on Warrenfeltz because counsel advised the Court that defendant was willing to waive service. ECF 14 at 1.

Soon thereafter, plaintiff filed a motion for reconsideration as to ECF 15 and ECF 16, arguing that she had successfully effected service as to all defendants in late December 2020. *See* ECF 18 (the "Reconsideration Motion"). And, Ogunsula filed a motion for Clerk's Entry of Default as to Capasso, under Fed. R. Civ. P. 55(a). *See* ECF 27 (the "Default Motion"). It was supported by her Affidavit. ECF 27-1. Plaintiff argued that she had effected service as to Capasso on February 25, 2021, by mailing summons to Melissa Lambert, the County Attorney for Harford County. ECF 27-1 at 2. According to plaintiff, because twenty-one days had elapsed without a response from Capasso, an entry of default was warranted. *Id.*

I denied both motions by Memorandum (ECF 29) and Order (ECF 30) of April 16, 2021. As to the Reconsideration Motion, I reiterated that plaintiff had not evidenced that she had successfully effected service as to Capasso or Warrenfeltz.  ECF 29 at 3.  And, I explained that Ogunsula had failed to provide the Court with any reason to overlook the Fourth Circuit's preference for deciding cases on the merits.  ECF 29 at 3.

Likewise, I denied the Default Motion.  *Id.* at 4.  First, I pointed out that plaintiff's evidence of service on Capasso was not adequate.  *Id.* at 3.  Moreover, I explained that, under Standing Order 2012-01, the "Maryland Attorney General and various County Attorneys," including the County Attorney for Harford County, "were granted an automatic 60-day extension of time to respond to complaints filed against officials whom they represent in exchange for their agreement to accept service on behalf of those officials."  *Id.* at 4 (citing *In Re: State Prisoner Litigation*, Misc. No. 00-308 (D. Md. April 27, 2012) at ECF 37).  Thus, I concluded that, even assuming that plaintiff had properly effected service on Capasso through her mailing to Ms. Lambert, Capasso was not in default, because his response was not due until April 26, 2021.  ECF 29 at 4.

## II.     Motion to Amend Briefing

Plaintiff has filed a motion for leave to file amended versions of the Capasso Opposition and the Motion to Strike.  *See* ECF 36.  In support of the Motion to Amend Briefing, plaintiff has submitted amended versions of her Motion to Strike (*see* ECF 36-1 at 1-4) and the Capasso Opposition.  *See* ECF 36 at 4-10.  In particular, Ogunsula indicates that she seeks to correct "typographical errors and other minor corrections . . . ."  *Id.* at 2.

Plaintiff avers that the counsel of record for Capasso did not consent to these amendments. *Id.*  However, Capasso has not filed an opposition to the Motion to Amend Briefing.  And, a review of plaintiff's proposed amendments reveals that the amendments do not change the substance of

either filing.  Therefore, I shall grant the Motion to Amend Briefing.  I shall refer to ECF 36-1 at 1-4 as the "Motion to Strike" and ECF 36 at 4-10 as the "Capasso Opposition."

### III.    Motion to Strike

Ogunsula filed the Motion to Strike for the purposes of "correct[ing] the record with regard to notice of the complaint provided to defendant Warden Capasso and service of the summons related to the initial complaint to defendant."  ECF 36-1 at 1-2.  Moreover, plaintiff seeks to "strike and object to the Court's extension to Defendant Capasso for the record."  *Id.* at 2.  And, plaintiff indicates that she received a return receipt, purportedly evidencing service on defendant Capasso on February 25, 2021.  *Id.* at 3; *see* ECF 34-2.

Plaintiff summarily asserts that the delay in Capasso's response to the Complaint has been prejudicial to her case.  ECF 35 at 3.  Moreover, she indicates that she "has suffered severe retaliation with regard to this action."  *Id.* at 4.

However, as I previously explained, even assuming the docketed return receipt evidenced effective service on Capasso, he had until April 26, 2021, to respond to the Complaint.  ECF 29 at 3-4.  Thus, the Capasso Motion, filed on April 23, 2021, was timely.  *See* ECF 31.

Moreover, even if the Capasso Motion had been untimely filed, it has since been fully briefed.  Although plaintiff asserts prejudice due to the delay, she does not point to any actual prejudice.  Accordingly, in light of the Fourth Circuit's preference to decide cases on the merits, *see Shaffer Equip. Co.*, 11 F.3d at 453, I shall deny the Motion to Strike.

### IV.    The Capasso Motion and the MSP Motion

#### A.  Standard of Review

As noted, the Capasso Motion and the MSP Motion are styled as motions to dismiss for failure to state a claim or, in the alternative, for summary judgment.  *See* ECF 23; ECF 31.  A

motion styled in the alternative, to dismiss or for summary judgment, implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (per curiam).

A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so. *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.' ") (citation omitted). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's

consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit

requirement of former Rule 56(f)).  "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at her peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the nonmoving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature.  And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant."  *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule

56(d) affidavit. *Harrods*, 302 F.3d at 244 (internal citations omitted). Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).

In this case, plaintiff has submitted a Rule 56(d) affidavit in her responses to the MSP Motion and the Capasso Motion. ECF 28-4; *see* ECF 36 at 12. She has expressly requested the opportunity to conduct discovery. In general, "[s]ummary judgment before discovery forces the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014). Therefore, I shall construe the MSP Motion and the Capasso Motion as motions to dismiss.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *see In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Services Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). The rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions'. . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 11 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of

relief.  *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en

banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).   Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*) (citation omitted).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).   In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg. v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am.*

*Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows. Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)); *see USA Eng. Language Ctr. v. Accrediting Council for Continuing Educ. & Training, Inc.*, ___ F. App'x ___, 2021 WL 3162671, at *2 (4th Cir. July 27, 2021). And, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 882 F.3d at 167. In other words, the "general rule" is that "the exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint." *Id.* at 165. But, "in cases where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.* at 167.

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro*, 930 F.3d at 248; *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __U.S.__, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A

copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

As noted, a number of exhibits were attached to the MSP Motion, the Capasso Motion, and Ogunsula's briefs in opposition to these motions.  In particular, two exhibits were appended to the MSP Motion: a "Declaration of Michael Warrenfeltz" (ECF 23-2) (the "Warrenfeltz Declaration") and Warrenfeltz's Incident Report (ECF 23-3) (the "Incident Report").  Pertinent here, the Incident Report includes a copy of the arrest warrant upon which Warrenfeltz relied.  *See* ECF 23-3 at 11-15.

Capasso also submitted three exhibits with his motion, including a notice of plaintiff's commitment pending hearing (ECF 31-2) (the "Commitment Notice") and a notice of plaintiff's release from commitment (ECF 31-3) (the "Release Notice"), both of which were filed in the District Court for Harford County.  Capasso also filed an exhibit reflecting plaintiff's incarceration history at the Detention Center.  *See* ECF 31-4 ("Incarceration History").

In addition to her Rule 56(d) affidavit (ECF 28-4), plaintiff submitted three exhibits with the MSP Opposition.  These include her affidavit attesting to the veracity of the information contained within the MSP Opposition (ECF 28-1); a copy of plaintiff's phone log for the dates between August 26, 2017 and September 3, 2017; and copies of text messages that Ogunsula received between the morning of August 29, 2017 and the evening of September 2, 2017 (ECF 28-2) (the "Phone Records").  She also submitted an exhibit that contains various records concerning her arrest and commitment at the Detention Center,  including a copy of the "State's Request for Nolle Prosequi" (ECF 28-3 at 1) (the "Nolle Prosequi"), a copy of the docket from defendant's criminal case in the District Court for Harford County (*id.* at 2-4) (the "Docket"), and a police

report from the Metropolitan Washington Airports Authority (ECF 28-3 at 5-6) (the "Police Report").

In addition, plaintiff submitted three exhibits with the Capasso Opposition, which are docketed at ECF 34-1 to ECF 34-3.[8]  Specifically, plaintiff submitted an affidavit contending that the information contained in the Capasso Opposition and accompanying exhibits is accurate (ECF 34-1); a return receipt reflecting a mailing sent to Melissa Lambert at the address of 220 S. Main Street, Bel Air, Maryland 21014, which was delivered on February 25, 2021 (ECF 34-2) (the "Return Receipt"); and an "Agreement of Bail and Indemnity" entered with Freedom Fighters 2, Inc. on September 1, 2017 (ECF 34-3) (the "Agreement").

As to the Warrenfeltz Declaration (ECF 23-2), the Incarceration History (ECF 31-4), plaintiff's affidavits (ECF 28-1; ECF 34-1), the Phone Records (ECF 28-2), the Police Report (ECF 28-3 at 5-6), the Return Receipt (ECF 34-2), and the Agreement (ECF 34-3), plaintiff did not reference these exhibits in her Complaint, nor are they integral to her suit.  In addition, plaintiff did not rely on or otherwise reference the majority of the Incident Report (ECF 23-3).  Therefore, I shall not consider these items in resolving the Capasso Motion or the MSP Motion.

However, I shall consider the copy of the arrest warrant for plaintiff, included within the Incident Report.  ECF 23-3 at 12-15.  Ogunsula discusses the warrant in the Complaint (ECF 1 at 4-5) and it is integral to the suit.  *Id.* at 4.  And, plaintiff does not question the authenticity of the warrant.  *See Green v. Cty. of Mt. Vernon*, 96 F. Supp. 3d 263, 284 (S.D.N.Y. 2015) (considering a search warrant attached to a defendant's motion to dismiss where plaintiff referenced the warrant in her complaint, averred that the warrant lacked particularity and probable cause, but did not suggest that the warrant was inauthentic); *McPhearson v. Anderson*, 874 F. Supp. 2d 573, 579 n.7

_____

[8] These exhibits were submitted with the original Capasso Opposition.  *See* ECF 34.

(E.D. Va. 2012) (considering an arrest warrant attached to a motion to dismiss because plaintiff did "not challenge[ ] the warrant's authenticity, and he clearly relie[d] on it throughout his Complaint").

Moreover, I may "take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x. 200 (4th Cir. 2016); *see* Fed. R. Evid. 201(b)(2); *see also Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records"); *Schultz v. Braga*, 290 F. Supp. 2d 637, 651 n. 8 (D. Md. 2003) (taking judicial notice of dockets in state proceedings). Accordingly, I may take judicial notice of the Commitment Notice (ECF 31-2), the Release Notice (ECF 31-3), the Nolle Prosequi (ECF 28-3 at 1), and the Docket (*id.* at 2-4).

In reviewing the Motion, I am mindful that plaintiff is self-represented. Therefore, her pleadings are "liberally construed" and "held to less stringent standards than [those filed] by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "However, liberal construction does not absolve Plaintiff from pleading a plausible claim." *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md. 2014), *aff'd*, 584 F. App'x 135 (4th Cir. 2014); *see also Coulibaly v. J.P. Morgan Chase Bank, N.A.*, DKC-10-3517, 2011 WL 3476994, at *6 (D. Md. Aug. 8, 2011) ("[E]ven when pro se litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim."), *aff'd*, 526 F. App'x 255 (4th Cir. 2013).

Moreover, a federal court may not act as an advocate for a self-represented litigant. *See Brock v. Carroll*, 107 F.3d 241, 242-43 (4th Cir. 1996); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990). Therefore, the court cannot fashion claims for a plaintiff

because she is self-represented.  *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986); *see also M.D. v. Sch. Bd. of City of Richmond*, 560 F. App'x 199, 203 n.4 (4th Cir. 2014) (rejecting self-represented plaintiff's argument that district court erred in failing to consider an Equal Protection claim, because plaintiff failed to allege it in the complaint).  As the Fourth Circuit has said: "To do so would not only strain judicial resources by requiring those courts to explore exhaustively all potential claims of a pro se plaintiff, but would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party."  *Beaudett*, 775 F.2d at 1278.

### B.  Section 1983 Generally

Suit is brought pursuant to 42 U.S.C. § 1983.  ECF 1 at 2.  Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

### C.  Discussion

The MSP Defendants and Capasso launch a number of challenges to the Complaint's viability.  The MSP Defendants contend that the Complaint is subject to dismissal because plaintiff's suit against the MSP and defendant Jones is barred by Eleventh Amendment immunity.

*Id.* at 6-8, 9.   Further, the MSP Motion avers that Warrenfeltz did not violate plaintiff's constitutional rights and, even if he had, Warrenfeltz would be entitled to qualified immunity.   ECF 23-1 at 10-15.   In addition, both motions contend that plaintiff's § 1983 claim must fail as to defendants Jones and Capasso because the Complaint fails to allege facts that show they had any personal involvement in a deprivation of plaintiff's rights.   ECF 23-1 at 8-9; ECF 31-1 at 2-4.[9]

I shall address each argument, in turn.

### 1.   Sovereign Immunity

The MSP Motion posits that the MSP and Jones are immune from suit.   ECF 23-1 at 6, 9. The MSP Defendants assert that the "MSP is a principal department of the State of Maryland." *See* Md. Code, § 2-201 of the Public Safety Article ("P.S."); Md. Code, § 8-201(b) of the State Government Article ("S.G.").   Therefore, it is treated as if it is "the State of Maryland for purposes of immunity."   ECF 23-1. at 6.   Accordingly, the MSP Defendants contend: "Because suing MSP is akin to suing the State of Maryland, the Eleventh Amendment bars such a suit."   *Id.* at 7.

The MSP Defendants also argue that "claims brought pursuant to 42 U.S.C. § 1983 only apply to 'persons.'"   *Id.* at 8.   And, in their view, the MSP "cannot be considered a person for purposes of § 1983."   *Id.* (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

Further, the MSP Defendants assert that plaintiff's claim against Jones is subject to dismissal on the ground that "he is named only in his official capacity."   ECF 23-1 at 9; *see* ECF

---

[9] The MSP Defendants initially argued that suit was barred by the applicable statute of limitations, which expired on August 30, 2020, one day before the Complaint was filed.   ECF 23-1 at 6.   But, in the MSP Opposition, plaintiff noted that August 30, 2020 fell on a Sunday.   ECF 28 at 9.   Thus, Ogunsula contended that, in accordance with Fed. R. Civ P. 6(a)(1)(C), "the applicable filing period was extended until the next business[,] which was Monday August 31, 2020," or, put another way, the day on which she initiated the instant action.   ECF 28 at 9.   In the MSP Reply, the MSP Defendants "concede this issue[,] and withdraw their arguments on this point."   ECF 33 at 2.

1 at 1.  According to the MSP Defendants, under § 1983 "neither a State nor one of its officials acting in his or her official capacity qualifies as a person subject to suit."  ECF 23-1 at 9 (citation and internal quotation marks omitted).

Plaintiff does not appear to contest that dismissal of the MSP is appropriate, explaining only that the MSP was "named in this suit along with the names of the defendants . . . to show where the defendants work."  ECF 28 at 8.  But, plaintiff claims that "Jones can be sued in his official capacity because he is a final policy maker and if it is shown that his direct policies or unwritten policies within the organization encourage or acquiescence [sic] to racially discriminatory traffic stops or arrests, he is not entitled to immunity."  *Id.*

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."

The Supreme Court has explained: "Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suit for damages by citizens against their own States."  *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (collecting cases); *see, e.g.*, *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011); *Lapides v. Bd. of Regents of Univ. Sys. of Georgia,* 535 U.S. 613, 618 (2002); *Kimmel v. Fla. Bd. of Regents*, 528 U.S. 62, 72-73 (2000). Thus, "the ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."  *Garrett*, 531 U.S. at 363; *see  Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019), *cert. denied*, __ U.S.__, 140 S. Ct. 903 (2020).

Accordingly, absent waiver or a valid congressional abrogation of sovereign immunity, the states enjoy immunity from suits for damages brought in federal court by their own citizens, even

though the text of the Eleventh Amendment does not explicitly address such a scenario. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Garrett*, 531 U.S. at 363 ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted).

As the Supreme Court affirmed in *Garrett*, 531 U.S. at 363, among several other decisions, it has construed the Eleventh Amendment to embody the broader principles of state sovereign immunity. The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities . . . ." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

The doctrine of state sovereign immunity from private suit predates the enactment of the Eleventh Amendment and is "a broader doctrine . . . ." *See Williams v. Morgan State Univ.*, 850 F. App'x 172, 174 (4th Cir. 2021) (per curiam) (citing *Alden v. Maine*, 527 U.S. 706, 724 (1999); *Hans v. Louisiana*, 134 U.S. at 3).[10]   In *Pense v. Md. Dep't of Public Safety and Correctional Services*, 926 F.3d 97, 100 (4th Cir. 2019), the Fourth Circuit said, *id.*: "The Supreme Court 'has drawn on principles of sovereign immunity to construe the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well

_____

[10] In *Williams*, 850 F. App'x at 174, the Fourth Circuit described the text of the Eleventh Amendment as a "rather narrow and precise provision . . . ." *Id.*

as by citizens of another State.'" (Quoting *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *see Lapides*, 535 U.S. at 618 ("The Eleventh Amendment provides that the 'Judicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the . . . States' by citizens of another State, U.S. Const., Amdt. 11, *and (as interpreted) by its own citizens*.") (emphasis added; ellipses in *Lapides*); *Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012).

Of import here, sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, sometimes referred to as an "arm of the state." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense*, 926 F.3d at 100; *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005). Put another way, sovereign immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195-96 (4th Cir. 2016) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (cleaned up). In contrast, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)).

As noted, plaintiff has sued several defendants in their official capacities.  But, a suit lodged against an individual in his or her official capacity is tantamount to suit against the State.  As the Supreme Court has said, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself."  *Will*, 491 U.S. at 71 (1989) (internal citation omitted).

Sovereign immunity is "a weighty principle, foundational to our constitutional system." *Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021).  The defense of sovereign immunity is a jurisdictional bar, because "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'"  *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___U.S. ___, 139 S. Ct. 417 (2018); *see DiCocco v. Garland*, 18 F.4th 406, 413-14 (4th Cir. 2021).  However, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction."  *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)).

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state.  In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . .  Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . .  Third, a State remains free to

- 31 -

waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

Sovereign immunity has not been congressionally abrogated for claims under § 1983. In *Quern v. Jordan*, 440 U.S. 332, 345 (1979), the Supreme Court concluded that § 1983 suits by individuals against a state for money damages are barred by the Eleventh Amendment. It said: "[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"

Without question, a state may waive its sovereign immunity and permit suit in federal court. *See Lapides*, 535 U.S. at 618; *see Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 926 F.3d at 101. Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

Notably, state sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions." *Passaro*, 935 F.3d at 248 (citing *Seminole Tribe of Florida*, 517 U.S. at 71 n.14). And, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law. However, to avoid the bar to suit on this basis, the complaint must be lodged against a state official, and it must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

Pertinent here, the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts. *See* S.G. § 12-202(a). But, it has not waived its sovereign immunity as to a § 1983 suit in federal court. "A State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued." *Halderman*, 465 U.S. at 100 (emphasis omitted). Therefore, plaintiff's claims for damages against the MSP must be dismissed. Likewise, plaintiff's claims for damages against Jones and Warrenfeltz, in their official capacities, are also subject to dismissal.

However, requests for prospective injunctive relief, are not barred by the Eleventh Amendment. *See Will*, 491 U.S. at 71 n.10 ("Of course, a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Kentucky v. Graham*, 473 U.S. 167 n.14). This is because sovereign immunity does not bar suits seeking prospective injunctive relief, as long as such relief would not impose monetary liability. *Edelman v. Jordan*, 415 U.S. 651, 664 (1974).

But, as explained below, plaintiff fails to plead facts that would show that she has suffered a constitutional violation. Therefore, her request for injunctive relief shall also be denied.

And, plaintiff has not sought to name Jones in his individual capacity. Accordingly, Jones shall also be dismissed from the suit.

### 2. Capasso

Ogunsula has brought suit against Capasaso only in his official capacity. ECF 1 at 1. Capasso, as Warden of the Detention Center, is a local official. Therefore, he is not protected by State sovereign immunity. Unlike a State official, a local official "'acting either in his official or in his individual capacity, is a 'person' within the meaning of § 1983.'" *Ashton v. Brown*, 339 Md.

70, 110, 660, A.2d 447, 467 (1995) (quoting *Ritchie v. Donnelly*, 324 Md. 344, 356, A.2d 432, 435 (1991)).

Nevertheless, to state a claim under § 1983, plaintiff must allege facts that show personal fault, based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). In other words, there is no respondeat superior liability under § 1983. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813, (1994); *see also Wilcox*, 877 F.3d at 170.

A municipality is also subject to suit under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). In the seminal case of *Monell*, the Supreme Court determined that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. *Id.* at 690-91; *see also Love-Lane*, 355 F.3d at 782. But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 384 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, __U.S.___, 137 S. Ct. 1342 (2017). But, plaintiff did not sue Harford County.

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665-683). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases).

A viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Board of Comm'rs of Bryan Cty. v. Brown* , 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). However, a municipality cannot be liable in a § 1983 action under a theory of respondeat superior. *Monell*,

436 U.S. at 693-94.  Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'"  *Lozman v. City of Riviera Beach*, __U.S. __, 138 S. Ct. 1945 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).

In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation."  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard Cty. Police Dep't*, CCB-10-1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).  As the *Monell* Court said, 436 U.S. at 694, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983."

In this case, however, I must underscore that plaintiff did not sue a municipality.  Nor does plaintiff allege facts that amount to an official policy or custom or a pattern and practice.   And, her claim against Capasso cannot survive the Capasso Motion because she has failed to allege any facts showing supervisory liability or that he was otherwise personally involved in the conduct that allegedly amounted to a deprivation of plaintiff's rights.  *See Wilcox*, 877 F.3d at 170 ("'[L]iability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights.'") (quoting *Vinnedge*, 550 F.2d at 928).

At most, the Complaint implies that Capasso, as the Warden of the HCDC, had the responsibility to supervise the various employees whose actions purportedly amounted to a violation of plaintiff's constitutional rights.  *See* ECF 1 at 1, 4-6.  As stated, the allegations do not

amount to a claim that Capasso acted in furtherance of a local governmental "law, policy, or custom." *Ashton*, 339 Md. at 112, 660 A.2d at 468; *see* ECF 31-1 at 4-5.

In the Capasso Opposition, Ogunsula alleges additional facts regarding the conditions of her confinement in the Detention Center.  Specifically, she claims that because of her high blood pressure, medical staff at the Detention Center promised her that "she could have her blood pressure checked twice a day, morning and night," but "this health check/service or protocol was not followed."  ECF 36 at 5 (emphasis omitted).  Moreover, she asserts that a bail bondsman told her that the Detention Center "does not restrict the times that bonds can be paid and that there is usually no significant delay between when they received the bond payment and when they make payment to the court/facility." *Id.* at 6.  And, she seems to allege that she was kept at the Detention Center longer than she should have been, because she elected to hire a private attorney. *Id.* at 7.

However, it is well established that "'a complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Sager v. Hous. Comm'n of Anne Arundel County*, 855 F. Supp. 2d 524, 557 (D. Md. 2012) (quoting *Arbitraje Casa de Cambio, S.A. v. U.S. Postal Serv.,* 297 F. Supp. 2d 165, 170 (D.D.C .2003)).  Moreover, even considering the facts as alleged in the Capasso Opposition, Ogunsula still fails to assert that Capasso had any knowledge, actual or constructive, of his subordinates' alleged misconduct, let alone that he failed to correct the misconduct, or that his failure to do so was the cause of plaintiff's harm.

Accordingly, I am persuaded that plaintiff's official capacity claim against Capasso is subject to dismissal under Fed. R. Civ. P. 12(b)(6).  However, I will afford plaintiff an opportunity to amend her suit to add a claim against Capasso in his individual capacity, as she has requested in the Motion to Amend Complaint, and to add facts, if she can do so, that would overcome the defects set forth above.

### 3.   Warrenfeltz

Unlike Capasso, Warrenfeltz is a State officer.  Plaintiff may not bring a suit for damages under § 1983 against Warrenfeltz in his official capacity, for the reasons discussed earlier.  But, sovereign immunity presents no barrier to suit as to a claim for damages against Warrenfeltz in his individual capacity.

Ogunsula asserts that Warrenfeltz violated her constitutional right to be free from unreasonable search and seizures, as guaranteed by the Fourth Amendment, by initiating a traffic stop "without an individualized reasonable suspicion that she had or was in the process of committing a traffic violation or crime."   ECF 1 at 2.  She also asserts that this stop violated  her rights under the Equal Protection Clause of the Fourteenth Amendment "to move freely without be [sic] stopped or profiled because of her race."  *Id.*  And, the Complaint asserts that Warrenfeltz violated plaintiff's rights under the Due Process Clause of the Fourteenth Amendment "by detaining her without making known the charges against her."  *Id.*

The MSP Motion asserts that plaintiff's claims against Warrenfeltz, in his individual capacity, are subject to  dismissal for failure to state a claim because the facts, as alleged, do not amount to a showing that Warrenfeltz violated Ogunsula's constitutional rights.  *See* ECF 23-1 at 10-13.  And, according to the MSP Defendants, even if he had, Warrenfeltz would be entitled to qualified immunity.  *See id.* at 13-15.

### a.   Qualified Immunity Generally

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'"  *Barrett v. PAE Government*

*Services, Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, ___U.S.___, 138 S. Ct. 577, 589 (2018)) (cleaned up); *see also Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___U.S.___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015). In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The doctrine of qualified immunity "balances two important interest—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Barrett*, 975 F.3d at 428-29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The cases are legion in support of these principles. *See, e.g., Wesby*, 137 S. Ct. at 589; *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Robertson*, 989 F.3d at 288; *Ray v. Roane*, 948 F.3d 222, 229-30 (4th Cir. 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson*, 893 F.3d at 219; *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v.*

*Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013);
*Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as
measured by reference to clearly established law." *Harlow*, 457 U.S. at 818. An officer who
makes an honest but objectively unreasonable mistake is not protected by qualified immunity.
Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of
clearly established law, could reasonably believe that their actions were lawful.'" *Williams v.
Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d
183, 188 (4th Cir. 2012). Qualified immunity "'gives government officials breathing room to
make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S.
228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Robertson*, 989
F.3d at 288 ("'[I]n gray areas, where the law is unsettled or murky, qualified immunity affords
protection to' government officials who take 'action[s] that [are] not clearly forbidden.'") (quoting
*Occupy Columbia*, 738 F.3d at 118); *Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011)
(observing that qualified immunity protects government officials from liability for "'bad guesses
in gray areas'") (citation omitted). In other words, "[t]he qualified immunity standard 'gives ample
room for mistaken judgments' by protecting 'all but the plainly incompetent or those who
knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v.
Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam).

Thus, "even when the facts in the record establish that the officer's conduct violated a
plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable
person in the [officer's] position could have failed to appreciate that his conduct would violate
those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th

Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

Notably, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818. Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

Of relevance here, qualified immunity is an "'immunity from suit rather than a mere defense to liability[.]'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d, 374, 377 n.2 (4th Cir. 2007) (citation omitted).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of*

*Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018). Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Ray*, 948 F.3d at 226; *Owens*, 767 F.3d at 395-96.

The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Ray*, 948 F.3d at 226; *Labowitz*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). "The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred . . . . [and] [t]he defendant bears the burden of proof on the second question—*i.e.*, entitlement to qualified immunity." *Henry*, 501 F.3d at 377–78 (internal citations omitted). If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457

U.S. at 818.   On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue.  *Scinto*, 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118.  "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'"  *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640).  Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself."  *Owens*, 767 F.3d at 399; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017).

Generally, to "determine whether a right is clearly established," courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[] the appropriate United States Court of Appeals, or the highest court of the state.'"  *Wilson*, 893 F.3d at 221 (citation omitted); *see Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Carroll*, 574 U.S. at 16-17 (quoting al-Kidd, 563 U.S. at 741); *see Kisela v. Hughes*, ___U.S.___, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly*, ___U.S ___, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015); *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014); *see also Reichle*, 566 U.S. at 664 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official

would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017). Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d, at 582-83. Thus, "even without 'directly on-point, binding authority,' qualified immunity is inappropriate if 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray*, 948 F.3d at 229-30 (quoting *Booker*, 855 F.3d at 543).

But, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 575 U.S. at 613-14; *Plumhoff*, 572 U.S. at 779. Rather, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of

qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

As discussed, *infra*, plaintiff fails to allege a plausible claim that Warrenfeltz violated her constitutional rights.   But, because I shall grant leave to amend, resolution of the qualified immunity issue would be premature.   Assuming that plaintiff states a claim for a constitutional violation, the clearly established prong of the qualified immunity analysis would turn on the particular circumstances in which the alleged constitutional violation occurred.  *See Kislea*, 138 S. Ct. at 1152 (explaining that courts are "not to define clearly established law at a high level of generality" and "[s]pecificity is especially important in the Fourth Amendment context . . . .") (citations omitted and alteration added).

I decline to speculate whether plaintiff will, in an amended complaint, adequately allege a violation of her constitutional rights.  And, until then, I cannot say whether her rights were clearly established at the time of the alleged violation.  As a result, I cannot resolve the qualified immunity claim at this time.

### b.       Reasonable Suspicion

Ogunsula challenges the legality of the traffic stop on the ground that Warrenfeltz lacked any basis to believe that she had committed a traffic violation.   ECF 1 at 2.   Accordingly, plaintiff claims that the stop violated the Fourth Amendment to the Constitution.  *Id.*  The MSP Defendants counter that Warrenfeltz's observations provided him with probable cause to believe that plaintiff was in violation of Maryland law, thereby establishing the legality of the stop.  ECF 23-1 at 11.

In the Complaint, plaintiff admits that while she was driving a motor vehicle, she picked up her cell phone, which she was using for the purpose of accessing its GPS, placed it on her lap,

and she then "attached" her earbud to the phone.  ECF 1 at 3.  Nevertheless, Ogunsula alleges that she was not talking on the cell phone, and therefore was not in violation of Maryland law. Moreover, she asserts that "she was not speeding or handling her phone, or committing in [sic] any other traffic offense in the State of Maryland and the Trooper did not observe any such violation."  ECF 28 at 4.  And, she adds that Warrenfeltz "did not observe her with her cellphone in her hand," or otherwise see her "breaking any Maryland traffic laws."   ECF 1 at 4.   She also points out that "the Trooper did not issue a citation for a cell phone traffic violation."  *Id.* at 5.

Plaintiff seems to labor under the belief that, unless she was talking on the phone while holding it, she could not have violated Maryland law.  She also labors under the belief that the officer had to be 100% correct in his assessment of her conduct in order to conduct a lawful traffic stop.  Neither position is accurate.  Maryland law prohibits the handheld use of a cell phone while driving; the statute is not limited to conversational use.  *See* Md. Code (2020 Repl. Vol., 2021 Supp.) § 21-1124.2 of the Transportation Article ("Trans.").   And, the law does not demand infallibility from a police officer.

Of relevance here, Trans. § 21-1124.2(d)(2) provides: "A driver of a motor vehicle that is in motion may not use the driver's hands to use a handheld telephone other than to initiate or terminate a wireless telephone call or to turn on or turn off the handheld telephone."  The statute also specifies that a "handheld telephone" refers to a "handheld device used to access wireless telephone service."  Trans. § 21-1124.2(a)(2).  Moreover, in order to uphold the traffic stop, the law does not require the police officer to have been correct in his belief that plaintiff was unlawfully using her cell phone.

The Fourth Amendment protects against unreasonable searches and seizures.  *United States v. Mendenhall*, 446 U.S. 544, 551 (1980).  This protection extends to brief investigatory

stops.  *United States v. Drakeford*, 992 F.3d 255, 262 (4th Cir. 2021); *United States v. Curry*, 965 F.3 313, 319 (4th Cir. 2020) (en banc).

When a police officer stops an automobile and detains the occupant, the stop constitutes a seizure that implicates the Fourth Amendment, even if the purpose of the stop is limited and the detention is brief.  *See Kansas v. Glover*, \_\_\_U.S.\_\_\_, 140 S. Ct. 1183, 1187 (2020); *see e.g., Brendlin v. California*, 551 U.S. 249, 255 (2007); *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020); *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018); *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015); *United States v. Sowards*, 690 F.3d 583; 588-89 (4th Cir. 2012);  *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011), abrogated in part on other grounds by *Rodriguez v. United States*, 575 U.S. 348 (2015).

In general, a traffic stop begins when a motor vehicle "is pulled over for investigation of a traffic violation."  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  In *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019), the Court reiterated: "'When an officer observes a traffic offense – however minor – he has probable cause to stop the driver of the vehicle.'" (quoting *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014)).  But, probable cause is not required to effectuate a lawful stop.

The "usual traffic stop is more analogous to a so-called '*Terry* stop' . . . ."  *Berkemer v. McCarthy*, 468 U.S. 420, 439 (1984); *see Rodriguez*, 575 U.S. at 354; *Johnson*, 555 U.S. at 330-31; *Bernard*, 927 F.3d at 805.  Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, a police officer may stop a motorist for investigative purposes, without violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, so long as there

is reasonable, articulable suspicion, based on specific facts, that criminal activity is afoot. *Id.* at 30.

"Reasonable suspicion" is "an objective standard." *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014). It is "a particularized and objective basis for suspecting the person stopped of criminal activity . . . ." *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *see Kansas v. Glover*, 140 S. Ct. at 1187; *United States v. Black,* 707 F.3d 531, 539 (4th Cir. 2013); *United States v. Massenburg*, 654 F.3d 480, 486 (4th Cir. 2011); *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009). Notably, it "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but a "minimal level of objective justification [is required] for making the stop." *Illinois v. Wardlow*, 527 U.S. 199, 123 (2000); *see United States v. Lawing,* 703 F.3d 229, 236 (4th Cir. 2012); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000).

Under the dual inquiry standard articulated in *Terry*, 392 U.S. 1, the court examines "whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682; *Bowman*, 884 F.3d at 209; *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016); *Williams*, 808 F.3d at 245; *United States v. Guijan-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011); *see also Bernard*, 927 F.3d at 805; *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017). Because the reasonable suspicion standard is an objective one, however, the officer's subjective state of mind is not considered. *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011). And, of import here, "'[t]o be reasonable is not to be perfect.'" *Glover*, 140 S. Ct. at 1188 (citation omitted).

As stated, plaintiff admits that she was handling her cell phone while driving.  ECF 1 at 3.  And, the facts alleged in the Complaint show that Warrenfeltz was in a position to observe this conduct.  *Id.*  Indeed, when Warrenfeltz approached plaintiff's car, he promptly asked Ogunsula was whether she had been using her cell phone.  *Id*.  The timeline outlined by the Complaint reflects that these events occurred during the day, with its attendant visibility.  *See id.* at 5 (asserting that plaintiff could not make a phone call until after 8:00 p.m. or 9:00 p.m., and by then she had been at HCDC for 8 to 9 hours).  Moreover, plaintiff alleges that Warrenfeltz was tracking her vehicle, which she found unsettling.  *Id.* at 3.  Thus, the allegations establish that the officer was in a position to observe plaintiff's conduct.

It is clear that Warrenfeltz saw plaintiff handling her phone.  It is immaterial for purposes of the legality of the stop that plaintiff was not talking on the phone or sending a text message.  Given that Maryland law renders unlawful the handheld use of a cell phone, the officer's observation of plaintiff's conduct gave rise to reasonable suspicion that she had committed a traffic violation under Maryland law.  *See Santos v. State*, 230 Md. App. 487, 494, 148 A.3d 117, 121 (2016) (finding that a police officer had reasonable suspicion to initiate a traffic stop where the officer observed a driver "manipulating his cell phone while driving"); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("Although an officer's reliance on a mere hunch is insufficient to justify a stop . . .  the likelihood of criminal activity need not rise to the level required for probable cause and it falls considerably short of satisfying a preponderance of the evidence standard.") (internal citation and quotation marks omitted).

Certainly, the Court must assume the truth of all allegations in the suit in resolving a Rule 12(b)(6) motion.  But, the Court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."  *E. Shore Mkts. Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th

Cir. 2000) (citing 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE, § 1357 (2d 3d. 1990)).  Again, plaintiff admits that she was using the GPS on her phone for directions while driving, and that she picked up the phone to connect the ear piece.  *See* ECF 1 at 3.

Based on the facts alleged, TFC Warrenfeltz had reasonable, articulable suspicion to believe that plaintiff had committed a traffic violation under Maryland law.  The legality of the stop does not turn on whether plaintiff had, in fact, violated Maryland law.

### c.      Arrest

Plaintiff does not expressly challenge the legality of her arrest.  *See* ECF 1 at 2.  But, some of the allegations contained in the Complaint could be construed as setting forth such an assertion.  *See id.* at 4.    And, the MSP Defendants have interpreted the Complaint as a challenge to the lawfulness of plaintiff's arrest.   *See* ECF 23-1 at 11-12, 14-15.  Thus, in light of Ogunsula's pro se status, I shall liberally construe the Complaint to include an allegation that plaintiff's arrest constituted a violation of the Fourth Amendment.

Nonetheless, any such claim must fail because Warrenfeltz arrested plaintiff pursuant to a facially valid warrant.  *Cf. Vaughn v. Perea*, ___ F. App'x ___, 2021 WL 5879176, at *1 (4th Cir. Dec. 13, 2021) (stating that service of a facially valid arrest warrant "creates a presumption of legality" and upholding dismissal of § 1983 claim alleging illegal arrest).  As the Supreme Court has said, an officer "executing an arrest warrant" is not "required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."  *Baker*, 443 U.S. at 146.  Courts in the Fourth Circuit have consistently stated as much.  *See Peacock v. Mayor and City Council of Baltimore*, 199 F. Supp. 2d 306, 309 (D. Md. 2002) ("It is well established that when an arrest and subsequent

detention are undertaken pursuant to a facially valid warrant, there is no violation of the Fourth Amendment."); *see also Mitchell v. Aluisi*, 872 F.2d 577, 579 (4th Cir. 1989); *Turner v. Kight*, 192 F. Supp. 2d 391, 403–04 (D. Md. 2002); *Carter v. Mayor and City Council of Baltimore*, 164 F. Supp. 2d 509, 516 (D. Md. 2001); *Brooks v. Prince George's County*, HAR-90-3073, 1992 WL 63393, at *1 (D. Md. 1992). *Cf. Green v. Brooks*, 125 Md. App. 349, 373-74, 725 A.2d 596, 608-609 (1999) (concluding that there was no liability under Maryland law for police officer who arrested the wrong person pursuant to a facially valid warrant).

Plaintiff invokes this Court's decision in *Johnson v. Hammett*, ELH-18-1059, 2019 WL 7185559 (D. Md. Dec. 23, 2019), in support of her Fourth Amendment claim. *See* ECF 28 at 5. *Johnson* involved an unfortunate incident of mistaken identity. The plaintiff in that case was arrested pursuant to a warrant issued for an individual who happened to share the plaintiff's name. *Johnson*, 2019 WL 718559, at **2-3. The gravamen of the contention against the arresting office turned on the claim that the officer had "acted unreasonably in failing to verify whether plaintiff was the person for whom the warrant was issued." *Id.* at *12.

But, *Johnson* does not help plaintiff here. Notably, in *Johnson* the Court found that the arresting officer's conduct did not amount to a violation of the Fourth Amendment. *Id.* at *13. I explained: "An arrest pursuant to a facially valid warrant, even if it is the product of mistaken identity, does not give rise to a constitutional violation." *Id.* Moreover, I highlighted that "it was reasonable for [the arresting officer] to conclude, on the basis of the information available to him, that plaintiff was a fugitive . . . ." *Id.* (citation omitted). I also noted that the Supreme Court "has declined to hold that 'a Sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence.'" *Id.* (citing *Mitchell*, 872 F.2d at 579 (quoting *Baker*, 443 U.S. at 145-46)).

The facts here, although equally unfortunate, do not yield a result favorable to plaintiff. In particular, Ogunsula does not allege that the arrest warrant did not pertain to her or that Warrenfeltz could have uncovered facts that would have shown that she was not the person named in the warrant or that she had not committed the crime described in the warrant. Rather, she avers only that she told Warrenfeltz that the charges filed against her were not true. *See* ECF 1 at 4. The trooper obviously could not be the arbiter of that assertion. Moreover, a review of the arrest warrant reveals no obvious defects. *See* ECF 23-3 at 12-15. Accordingly, plaintiff fails to state a claim based on her arrest.

### d.    Due Process

Plaintiff claims that Warrenfeltz violated her right to due process under the Fourteenth Amendment to the Constitution by "detaining her without making known the charges against her . . . ." ECF 1 at 2. However, the Fourteenth Amendment has no bearing on a claim of this nature. *See Davis v. Jenkins*, HAR-91-3127, 1993 WL 195142, at *3 n.3 (D. Md. Jun. 4, 1993) (noting that the Court had found "no legal authority suggesting that the Fourteenth Amendment grants a suspect the right to be informed of the basis of his arrest").

To the extent that plaintiff meant to lodge a due process challenge on the ground that Warrenfeltz failed to advise her of her rights under *Miranda*, 384 U.S. 436 (*see* ECF 1 at 4), the claim is unavailing. In short, a failure to administer *Miranda* rights is not, in and of itself, a violation of plaintiff's due process rights. *See United States v. Patane*, 542 U.S. 630, 641 (2004) (pointing out that "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights"). Moreover, even if it was, "the 'complete and sufficient' remedy for a perceived *Miranda* violation is the exclusion of [unwarned] statements at trial." *Antonio v. Moore*, 174 F. App'x 131, 135 n.2 (4th Cir. 2006) (quoting *Patane*, 542 U.S. at 641-42).

And, to the extent that plaintiff intended to assert this claim as arising under the Sixth Amendment, it is nonetheless subject to dismissal.  The Sixth Amendment provides that an "accused" has the right "to be informed of the nature and cause of the accusation."  U.S. Const. Amend. VI.  But, the Sixth Amendment "imposes no duty on an officer to give notice of the charges against the accused at the time of arrest."  *Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793, 803 (D. Md. 2001) (citations omitted); *see Kladis v. Brezek,* 823 F.2d 1014, 1018 (7th Cir.1987) ("A defendant's right to be informed of the nature and cause of an accusation brought against him does not exist until the Government is committed to a prosecution.") (citation omitted).

Plaintiff alleges that she was detained at least ten hours before she was provided with a copy of the arrest warrant, which set forth the charges against her.  ECF 1 at 5.  Assuming, *arguendo*, a delay of this length constitutes an actionable violation of the Sixth Amendment, plaintiff's complaint against Warrenfeltz on this ground would still fail.  *Cf. Norris v. District of Columbia*, No. 89-3324, 1991 WL 16672, at *2 (D.D.C. Jan. 25, 1991) (finding a delay of five hours between plaintiff's detention and notice of charges was a "*de minimis* abridgment of the Sixth Amendment").  This is because, according to the Complaint, Warrenfeltz had last interacted with plaintiff when he took her to the Detention Center.  *See* ECF 1 at 5.  There is no allegation that Warrenfeltz had ongoing involvement with plaintiff, or that he participated in the commencement of adversarial proceedings against her.

Accordingly, the Complaint fails to state a Sixth Amendment claim as to Warrenfeltz.  *See Solis*, 153 F. Supp. 2d at 803 (explaining that where there is "no evidence of [the arresting officer's] involvement at the commencement of the adversarial proceeding against [plaintiff]," summary judgment as to plaintiff's Sixth Amendment claim was warranted).

### e. Equal Protection

Plaintiff contends that Warrenfeltz violated her Equal Protection rights "to move freely without be [sic] stopped or profiled because of her race." ECF 1 at 2. The MSP Motion argues that this claim must fail because Warrenfeltz had "probable cause to stop [plaintiff] and he arrested her based on a valid active warrant." ECF 23-1 at 12.

According to the MSP Defendants, "[t]hese facts "negate any claims that the Plaintiff was subjected to discrimination." *Id.* Moreover, in the MSP Reply, they assert that plaintiff has "failed to allege any . . . facts or data" in order to "support her allegation that she was subjected to enforcement of the traffic laws when similarly situated individuals of a different race were given a free pass." ECF 33 at 5.

The Equal Protection Clause provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This guarantee "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). And, of import here, the Equal Protection Clause "prohibits police officers from selectively enforcing laws based on race." *Johnson v. Holmes*, 782 F. App'x 269, 276-77 (4th Cir. 2019) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Notably, "[t]o prevail on a selective enforcement claim," the plaintiff must establish that she was subjected to conduct that "(1) was motivated by a discriminatory intent; and (2) had a discriminatory effect." *Johnson*, 782 F. App'x at 277 (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996) and *Cent. Radio Co. v. Cty. of Norfolk*, 811 F.3d 625, 634-35 (4th Cir. 2016)). In effect, "a plaintiff must show not only that similarly situated individuals were treated differently,

but that there was 'clear and intentional discrimination.'" *Cent. Radio Co.*, 811 F.3d at 635 (quoting *Sylvia Dev. Corp.*, 48 F.3d 810, 825 (4th Cir. 1995)).

The parties have not pointed to any Fourth Circuit decision that has squarely addressed the elements of a § 1983 claim of racial discrimination in regard to a traffic stop. However, Judge William D. Quarles, Jr. previously analyzed the issue in an  opinion resolving a motion for summary judgment, drawing on Eighth Circuit and Tenth Circuit precedent. *See Martin v. Conner*, 882 F. Supp. 2d 820 (D. Md. 2012).

Notably, Judge Quarles observed that the "Fourteenth Amendment right not to be stopped on the basis of race was clearly established in 2009." *Id.* at 839.   In analysis that is illuminating here, Judge Quarles wrote, *id.* at 839–40:

> "[E]ncounters with officers may violate the Equal Protection Clause when initiated . . .  based on racial considerations." *United States v. Frazier*, 394 F.3d 612, 617 (8th Cir. 2005); *see also Marshall v. Columbia Lea Reg'l Hosp*., 345 F.3d 1157, 1168 (10th Cir. 2003).  To avoid summary judgment, the burden is on the § 1983 plaintiff "challenging alleged racial discrimination in traffic stops and arrests" to "present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." *Marshall*, 345 F.3d at 1168.

In *Marshall*, 345 F.3d 1157, cited by Judge Quarles, the defendant officer moved for summary judgment on the plaintiff's claim that the officer stopped him on the basis of his race.  In response, Marshall presented evidence, "disputed, to be sure," that: (1) he did not commit the traffic infraction that was the alleged basis of the stop; (2) the officer knew Marshall's race before making the stop; (3) the officer "made repeated accusations that Mr. Marshall was on crack with no apparent basis"; (4) the officer noted Marshall's race and gender in the "gender" box of the incident report; and (5) the officer's "account of the events changed dramatically between the date of the incident and that date of his affidavit" in Marshall's suit. *Id.* at 1170.  The officer offered

"no nondiscriminatory explanation" for his actions, except to claim that Marshall committed the traffic violation. *Id.*

In light of that showing, the Tenth Circuit concluded that it was "a close question" whether Marshall had presented enough evidence to survive summary judgment, and remanded to the district court for further analysis. *Id.* at 1171.  It added that, if accurate, the officer's "extensive alleged [history of] misconduct," which led to his termination from another police department, "might raise an inference of racial discrimination . . .  or provide evidence that similarly situated individuals of a different race received different treatment." *Id.*

Judge Quarles then catalogued the evidence in the case before him, 882 F. Supp. 2d at 840–41 (internal footnotes omitted):

> Martin has identified evidence-much of which is disputed-that: (1) he was not speeding when Sgt. Conner saw him on Interstate 95; (2) Sgt. Conner had an unobstructed view of Martin as Martin drove by the officer's post on Interstate 95; (3) he did not smell marijuana in the rental car when Sgt. Conner stopped him; (4) although Sgt. Conner claimed that he stopped Martin for speeding, Sgt. Conner did not give Martin a speeding ticket; (5) although Sgt. Conner claimed to smell marijuana in the car, he did not use the K–9 unit called to the scene; (6) Sgt. Conner supervised TFC Gussoni's investigation into reopening the gun charges; (7) that investigation began the day after MSP received Martin's [Public Information Act] request for records related to the December 9 stop; and (8) Sgt. Conner "has a history of stopping and searching a disproportionate number of non-white motorists."

Judge Quarles compared the evidence in his case to the evidence in *Marshall* and said, *id.* at 840 n.22*:*

> Martin argues that "the evidence establishes that Defendant Sgt. Conner had an opportunity to observe Mr. Martin's race before pulling over" because the black box video shows Martin in the center lane of Interstate 95, without any cars between him and Sgt. Conner, as he passes Sgt. Conner's parked car.  Evidence that an officer looked directly at an individual as both were stopped, at a close range, can support an inference that the officer "was ascertaining [the individual's] race." *Marshall,* 345 F.3d at 1169.  That scenario does not necessarily lead to the conclusion that Sgt. Conner was able to determine Martin's race as Martin passed by at 60 miles per hour or faster, but a reasonable jury could conclude that Sgt.

Conner had the chance to see that Martin was African–American, and that is enough at this stage.

Martin further asserts that, because Sgt. Conner pulled Martin over about two miles past the point where Martin passed Sgt. Conner, Sgt. Conner "did not decide to pursue and stop Mr. Martin until he had a chance to observe Mr. Martin's race." That Sgt. Conner did not activate his emergency lights or begin to follow Martin until Martin had passed him (the moment at which Sgt. Conner allegedly had the opportunity to determine Martin's race), does not, alone, create an inference that he decided to make the stop based on Martin's race. In *Marshall,* the evidence showed that the defendant officer saw Marshall fail to stop at a stop sign, then, several blocks after the traffic violation, pulled next to Marshall at a stop, looked at Marshall's face, and moments later activated his emergency lights. *Id.* The sequence of events-that the officer, who was following Marshall before the violation, observed the violation, continued to follow Marshall without signaling him to pull over, determined that Marshall was African–American, then pulled him over, would permit a jury to reasonably infer that Marshall's race "played a part in the decision to initiate the stop." *Id.* Here, by contrast, Martin has not shown that Sgt. Conner observed the alleged traffic violation before he had the opportunity to see that Martin was African–American. Thus, there is no evidence that, before realizing that Martin is African–American, Sgt. Conner had reasonable suspicion to stop him but chose not to, as there was in *Marshall.*

Judge Quarles also said, *id.* at 841 (some internal citations omitted):

The evidence in *Marshall* was "close"; the evidence here is closer. *See Marshall,* 345 F.3d at 1170. Martin has not offered evidence that Sgt. Conner explicitly accused him of criminal activity based on racial stereotypes, blatantly checked Martin's race before deciding to pull him over, changed his story of the events leading to the stop, or had an "extensive" disciplinary record that included termination for misconduct. *Id.* at 1169–71. However, Martin need not provide overwhelming evidence-he must only show that a reasonable jury could conclude that a violation occurred. Viewing the evidence in the light most favorable to Martin, a reasonable jury could conclude that Sgt. Conner saw that Martin was African–American, then decided to pull him over. Summary judgment is inappropriate.

Although this case, *Martin,* and the Tenth Circuit's case in *Marshall* all involve scenarios in which the defendant officer could have known the plaintiff's race before initiating a traffic stop, that is where the similarity ends. In particular, the Complaint is devoid of any facts showing that Warrenfeltz said or did anything during his encounter with plaintiff that would indicate his actions were predicated on plaintiff's race or motivated by discriminatory animus. Nor does plaintiff

allege any facts regarding Warrenfeltz's history of  traffic stops, whether racially targeted or otherwise.  *See Cook v. Holmes*, 3:16-cv-00017, 2016 WL 6561458, at *4 (W.D. Va. Nov. 3, 2016) (finding that allegations that an officer had a history of "targeting African-American males for vehicle stops and intrusive searches" and that "similar complaints of unlawful treatment had been lodged by other African-American citizens,"  were sufficient to state a plausible claim for selective enforcement).

At bottom, plaintiff's Equal Protection claim boils down to allegations that plaintiff is Black, Warrenfeltz is white, Warrenfeltz observed Ogunsula's race before initiating the traffic stop, and Warrenfeltz ultimately did not issue a citation for the cell phone violation.  *See* ECF 1 at 3-4, 5.  But, these assertions are insufficient to plead a claim for selective enforcement.  *Cf. United States v. Mason*,  774 F.3d 824, 829-30 (4th Cir. 2014) (in a post-conviction case alleging ineffective assistance of counsel for failure to raise a claim of racially selective law enforcement, stating: "In light of 'the great danger of unnecessarily impairing the performance of a core executive constitutional function,' petitioners must demonstrate 'clear evidence' of racially animated selective law enforcement.") (quoting *United States v. Clovis*, 97 F.3d 739, 743 (4th Cir. 1996));  *United States v. Hammond*, 353 F. App'x 877, 879 (4th Cir. 2009) (explaining that within the context of a suppression motion, a bare assertion that an officer's actions were animated by a discriminatory bias is inadequate to plead a claim for selective enforcement); *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996) (same).

Thus, in sum, I am persuaded the allegations in the Complaint do not state a claim for selective enforcement of the law.  Therefore, this claim shall be dismissed, without prejudice, and with leave to amend.

### 4.  The Detention Center

Plaintiff asks the Court for compensatory and punitive damages against the Detention Center.  *See* ECF 1 at 7.  However, Ogunsula did not name the Detention Center as a defendant in the suit.  And, in any event, it is axiomatic that prisons are not proper defendants in a suit proceeding under § 1983.

As a number of courts have held, inanimate objects such as buildings, facilities, and grounds do not act under color of state law and thus are not subject to suit under § 1983.  *See*, *e.g.*, *Smith v. Montgomery County. Correctional Facility*, Civil Action No. PWG-13-3177, 2014 WL 4094963, at *3 (D. Md. Aug. 18, 2014) (holding that Montgomery County Correctional Facility "is an inanimate object that cannot act under color of state law and therefore is not a 'person' subject to suit under Section 1983."); *Preval v. Reno,* 57 F. Supp. 2d 307, 310 (E.D. Va. 1999) ("[T]he Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983."); *Brooks v. Pembroke City Jail*, 722 F. Supp. 1294, 1301 (E.D.N.C. 1989) ("Claims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit.").  Thus, any claim against the Detention Center must be dismissed.

### 5.  Injunctive Relief & Attorneys' Fees

As earlier described, plaintiff seeks injunctive relief.  Specifically, she asks for "an Order requiring that all Maryland State Police adhere to annual diversity and anti-racial profiling training and provide signature of their compliance."  ECF 1 at 7.  In addition, she requests that the Court issue "an order requiring correctional officers [to] provide to detainees and inmates information regarding their rights, access to phone calls, access to information regarding Bail bonds, and policies of the detention facility regarding confinement to a cell and time allowed outside of the cell."  *Id.*

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

However, for the reasons set forth above, plaintiff has failed to allege a plausible claim for relief under 42 U.S.C. § 1983 or § 1988.

## V.    Motion to Amend Complaint

Plaintiff asks the Court to grant her the opportunity to amend the Complaint. ECF 37. But, she does not provide grounds for amendment. And, more important, she does not specify the proposed amendments. However, I have gleaned from the proposed Amended Complaint the changes that plaintiff seeks to make.

Plaintiff previously sued Capasso only in his official capacity. But, in the caption of the proposed Amended Complaint, plaintiff seeks to proceed against Capasso in both his individual and official capacities. She also seeks to join as defendants an unspecified number of "Unnamed Correctional Officers," in their individual and official capacities. And, she seeks to correct various clerical-type errors, such as the date on which she was released from the Detention Center. ECF 37-1 at 1-2, 6-7.

Warden Capasso opposes the Motion to Amend Complaint on the ground that the specified amendments regarding plaintiff's claim against him should be rejected as futile. ECF 38 at 2. As

noted, the MSP Defendants have indicated that they "defer to the Court's judgment whether to grant leave to amend the Complaint." ECF 40 at 3.

A complaint may be amended "once as a matter of course" within twenty-one days of service of a defendant's answer or motion under Fed. R. Civ. P. 12(b), (e), or (f), "whichever is earlier." Fed. R. Civ. P. 15(a)(1)(b). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, the court "should freely give leave when justice so requires." *Id.*; *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Simmons v. United Mortg. & Loan Inv. LLC*, 634 F.3d 754, 769 (4th Cir. 2011).

Under Rule 15(a), the district court has "broad discretion concerning motions to amend pleadings." *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam); *see also Foman*, 371 U.S. at 182; *Labor v. Harvey*, 438 F.3d 404, 426-29 (4th Cir. 2006) (en banc). In general, a court may deny leave to amend in three circumstances: "'when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile.'" *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (quoting *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010)); *see Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 121 (4th Cir. 2013); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986).

Thus, a proposed amendment must not be futile. *See Foman*, 371 U.S. at 182. Pursuant to Rule 15(a), a "proposed amendment is futile when it is 'clearly insufficient or frivolous on its face.'" *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d at 503, 510 (4th Cir. 1986)). A proposed amendment is also futile if it would add a new claim that fails to state a claim upon which relief could be granted, and thus would not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

*See Save Our Sound OBX*, 914 F.3d at 228; *Davison*, 912 F.3d at 690; *see also Martin v. Duffy*, 858 F.3d 239, 247-48 (4th Cir. 2017) (affirming denial of leave to amend on futility grounds where the plaintiff's "pleading deficiency cannot be cured by amendment of his complaint"), *cert. denied*, ___U.S.___ 138 S. Ct. 738 (2018); *Devil's Advocate, LLC v. Zurich Am. Ins. Co.*, 666 F. App'x 256, 267 (4th Cir. 2016) (per curiam) (affirming district court's denial of leave to amend on the basis of futility, because the amended complaint would survive a motion to dismiss under Rule 12(b)(6)); *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 320 (4th Cir. 2010) (stating that a court need not grant leave to amend where the amendment would have "no impact on the outcome of the motion to dismiss"); *Frank M. McDermott, Ltd. v. Moretz*, 898 F.2d 418, 420-21 (4th Cir. 1990)("There is no error in disallowing an amendment when the claim sought to be pleaded by amendment plainly would be subject to a motion to dismiss under Fed. R. Civ. P. 12(b)(6).").

But, the review for futility "is not equivalent to an evaluation of the underlying merits of the case.  To the contrary, '[u]nless a proposed amendment may clearly be seen to be futile because of substantive or procedural considerations . . . conjecture about the merits of litigation should not enter into the decision whether to allow amendment.'"   *Next Generation Grp., LLC v. Sylvan Learning Ctrs., LLC*, CCB-11-0986, 2012 WL 37397, at *3 (D. Md. Jan. 5, 2012)(quoting *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980)).

The Motion to Amend Complaint failed to comply with Local Rule 103.6(c), which requires that a motion to amend include "(1) a clean copy of the amended pleading and (2) a copy of the amended pleading in which stricken material has been lined through or enclosed in brackets and new material has been underlined or set forth in bold-faced type."  Here, plaintiff neglected to provide the Court with a redlined copy of the proposed amended pleading.  Even so, failure to

comply strictly with Local Rule 103.6 is not fatal to plaintiff's motion, especially in light of her self-represented status. *See Milligan v. Brady*, RWT–10–2107, 2011 WL 1833346, at *1 n.1 (D. Md. May 13, 2011) ("As a pro se litigant, [the plaintiff's] failure to comply with Local Rule 103.6 is not fatal to her request for leave to amend, and the Court concludes that her filing contains sufficient information to consider her request without additional briefing."); *see also Awah v. Bd. of Educ. of Baltimore Co.*, WMN–09–1044, 2010 WL 1929908, at *2 (D. Md. May 11, 2010) (refusing to deny the pro se plaintiff's motion to amend on the ground that he had not filed a red-line copy and when there was no prejudice to the defendant).

Nonetheless, "where . . . the plaintiff fails to formally move to amend and fails to provide the district court with any proposed amended complaint or other indication of the amendments he wishes to make, the district court does not abuse its discretion" in denying a motion to amend the complaint. *Estrella v. Wells Fargo Bank, N.A.*, 497 F. App'x 361, 362 (4th Cir. 2012) (citations and internal quotation marks omitted); *see Bock v. Florists' Transworld Delivery, Inc.*, WDQ-12-3702, 2013 WL 5276551, at *7 (D. Md. Sept. 16, 2013) ("Without the proposed new complaint, it is not clear whether the amendments would be futile."). But, the Court is able to discern plaintiff's proposed changes.

As indicated, plaintiff offers two changes of substance. First, plaintiff seeks to add a claim against Capasso in his individual capacity. *See* ECF 37-1 at 1. But, she does not offer any new allegations concerning Capasso's involvement in her case, either in his official capacity or in his individual capacity. As explained earlier, a claim brought under § 1983 must allege personal involvement on the part of a defendant, whether the claim is brought against a defendant in his official or individual capacity. *Wilcox*, 877 F.3d at 170. And, the proposed amendments do not allege any facts that, if proven, would show that Capasso had any personal

involvement in this case.   Nonetheless, I shall grant the Motion to Amend Complaint as to the individual capacity claim against Capasso.  Specifically, I shall grant Ogunsula an opportunity to submit an Amended Complaint that presents facts that, if proven, would establish Capasso's personal involvement in the deprivation of plaintiff's constitutional rights, either in a supervisory role or otherwise.

Ogunsula also seeks to join Unnamed Correctional Officers as defendants.  *See* ECF 37-1 at 2.  However, she has not identified the number of such defendants or their roles.  No party has opposed this aspect of the Motion to Amend Complaint.  Nonetheless, it is plain that such an amendment, as crafted, would be futile.

Federal courts have generally frowned upon "John Doe" defendants.   The Fourth Circuit has made clear that Doe suits are permissible only against "real, but unidentified, defendants." *Schiff v. Kennedy*, 691 F.2d 196, 197 (4th Cir. 1982). A district court may dismiss an action, without prejudice, "if it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court."  *Id.* at 198; *see also Pair v. Alexander*, GLR-16-1492, 2018 WL 1583472, at *1 n.2 (Apr. 2, 2018) (dismissing claims against John Doe defendants on the ground the plaintiff "d[id] not raise specific allegations against the John Doe defendants"); *Massey v. Ojaniit*, 759 F.3d 343, 347 n.1 (4th Cir. 2014) (affirming district court's dismissal, without prejudice, of claims against "John and Jane Does, #1-10," where the plaintiff's allegations did not suggest that the identities of such persons could be ascertained through discovery or intervention by the court).   Rather, the "complaint must provide each John Doe defendant with fair notice of the specific facts upon which his individual liability rests." *Parker v. White*, 2012 WL 6701771, at *2 (E.D.N.C. Dec. 26, 2012) (citing *Nasious v. Two*

*Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007) and *Williams v. Burgess*, 3:09-CV-115, 2010 WL 1957105, at *3 (E.D. Va. May 13, 2010)).

Moreover, courts have found that the use of a "John Doe" designation is not permissible "if the plaintiff's ignorance of the defendant's true identity is the result of willful neglect or lack of reasonable inquiry." *Saunders v. Boddie-Noell Enters., Inc.*, 7:08-110, 2008 WL 2553047, *2 (W.D. Va. June 25, 2008) (citing 2 J. Moore et al., *Moore's Federal Practice* § 10.02(2)(d)(l) (3d ed. 2005)); *see also Williams v. 21st Mortg., Corp.*, PX-16-1210, 2017 WL 1133706, at *4 (D. Md. Mar. 27, 2017) (dismissing claims against Doe defendants because the plaintiff "had more than sufficient time to conduct a reasonable inquiry into [their] true identity").

With respect to Ogunsula's interactions with the HCDC correctional officers, the allegations in the proposed Amended Complaint are virtually identical to those outlined in the Complaint. *See* ECF 37-1 at 5-7 ; ECF 1 at 5-6.   Both the Complaint and the proposed Amended Complaint allege that unspecified "correctional officers" told Ogunsula that she would have to contact a bail bondsman to coordinate making bail. ECF 1 at 6; ECF 37-1 at 6. Plaintiff was also told by "correctional officers" that she would be extradited to Virginia, contradicting what plaintiff had been told at her bail hearing. ECF 1 at 6; ECF 37-1 at 6. Furthermore, plaintiff avers that, as a result of the Unnamed Correctional Officers' misconduct, she was "confined to a cell for an excessive amount of time," and detained after she had been granted bail. ECF 1 at 2; ECF 37-1 at 2. These allegations seem to pertain to a due process violation.

Such assertions are woefully deficient to support a cause of action against the Doe defendants. The proposed Amended Complaint fails to identify the number of correctional officers that plaintiff seeks to join to her suit and it does not ascribe the alleged conduct to any particular officer. Indeed, even if the Court were to allow their joinder, it is unclear how plaintiff could

identify the proper parties to be served.  *See Williams*, 2010 WL 1957105, at *2 (explaining that, in naming a Doe defendant, the "'complaint should state that the name is fictious and provide an adequate description of some kind which is sufficient to identify the person involved so that process can be served.'") (quoting *Dean v. Barber*, 951 F.2d 1210, 1216 (11th Cir. 1992)).

In addition, plaintiff has hardly demonstrated that she has been diligent in trying to determine the identities of the Unnamed Correctional Officers.   Nearly three years elapsed between Ogunsula's release from the HCDC and the filing of the Complaint.  Thereafter, close to nine more months transpired before plaintiff filed the Motion to Amend Complaint.  Yet, Ogunsula has not provided the Court with any information regarding the identities of the Unnamed Correctional Officers.  Nor has she demonstrated that she has expended any effort to ascertain their identities.  Thus, in my view, the joinder of the Unnamed Correctional Officers would be improper. *See Martin v. W. Va. Div. of Corr.*, 2015 WL 5443548, at *3 (S.D. W. Va. Sept. 15, 2015) (finding that joinder of Doe defendants was improper because plaintiff had failed ascertain their identities within two years of the events underlying the Complaint).[11] Accordingly, the proposed joinder of the Unnamed Correctional Officers is futile.

In sum, I shall grant the Motion to Amend Complaint in part and deny it in part, without prejudice.  In particular, I shall grant plaintiff an opportunity to file an Amended Complaint that includes a claim against Capasso in his individual capacity.  And, as stated previously, she may also amend to include an equal protection claim against Warrenfeltz.

---

[11] It is also likely that a suit against the Doe defendants would be subject to dismissal based on the expiration of limitations.

- 66 -

## VI.    Conclusion

For the foregoing reasons, I shall grant the Motion to Amend Briefing (ECF 36) and deny the Motion to Strike (ECF 35).  In addition, I shall grant the Motion to Amend Complaint (ECF 37) in part and deny it in part, without prejudice.  And, I shall grant the MSP Motion (ECF 23) as to the MSP and Jones, and with respect to the claims against Warrenfeltz arising under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment.  However, as to the Equal Protection claim against Warrenfeltz, I shall grant the MSP Motion, without prejudice and with leave to amend.  And, as to the Capasso Motion, I shall grant it without prejudice and with leave to amend.

Plaintiff may file an Amended Complaint, due within 28 days of the docketing of this Memorandum Opinion and the accompanying Order.  Specifically, she may amend the suit against Capasso, to name him in his individual capacity, and to include facts that, if proven, would establish that he was personally involved with the alleged deprivation of her constitutional rights, either in a supervisory capacity or individually.  She may also amend her Complaint to allege facts that, if proven, would establish an Equal Protection violation as to Warrenfeltz.

If plaintiff fails to file an Amended Complaint within the time provided, I shall instruct the Clerk to close the case.

An Order follows.


Date: December 23, 2021                              _____/s/_____

                                                     Ellen L. Hollander
                                                     United States District Judge